# EXHIBIT B

# OCTOBER 15, 2007 LETTER BRIEF OF STEPHEN BARRY, ESQ. (WITH DEBTOR'S PROPOSED FORM OF ORDER)

**BARRY • CORRADO**

ATTORNEYS AT LAW

2700 Pacific Avenue
Wildwood, New Jersey 08260
609 729 1333
Fax 609 522 4927
WWW.CAPELEGAL.COM

Stephen W. Barry*
Frank L. Corrado
Joseph C. Grassi**
J. Christopher Gibson
Jennifer K. Russo-Belles
Michele C. Hosner

*Certified Civil Trial Attorney
**Certified Criminal Trial Attorney

October 15, 2007

BY FAX TO (609) 463-6445

The Honorable Joseph C. Visalli, J.S.C.
Superior Court of New Jersey
Four Moore Road - DN 202E
Cape May Court House, NJ  08210

    Re:  Banc of America v. Quinn-Woodbine Leasing, et al
         Docket No. CPM-L-605-01

Dear Judge Visalli:

    Please accept this letter as our brief in opposition to the pending motion brought by attorney Stephen Reed on behalf of Banc of America Leasing to enforce the settlement in this matter.

    My purpose in writing is not to avoid the development of the proper terms of the settlement, but rather to make sure that those terms as fixed by Your Honor accurately reflect what was actually agreed to in the negotiations on June 11, 2007, and put on the record before you, as well as in subsequent negotiations between Mr. Reed and Mr. Corrado.

    I have taken the liberty of attaching to this letter an additional copy of the transcript of the settlement terms as placed before you on the record.

    The comments are clear, and quite succinct in comparison with the lengthy document attached to Mr. Reed's moving papers as a proposed final draft of a settlement agreement. I don't say this to criticize Mr. Reed. It is inevitable when dealing with banks that they want to have belts, suspenders, and back up agreements beyond what a non-banking person would think sensible. I appreciate that that is why so many catches and

The Honorable Joseph C. Visalli, J.S.C.
October 15, 2007
Page 2

hooks have been put in this document post agreement. I mean to cast no aspersions in saying this, but when you consider the lack of trust as between the parties on both sides of this case, the court can appreciate that it is important to be very careful to limit the agreement to what the parties actually agreed to, and not start larding the Agreement up with bank precautions, catches and "gotchas."

Certainly the parties agree that they have reached a global agreement as to all existing disputes among them, and need to resolve every issue that has been or could have been litigated in this dispute. The question is, what glosses can fairly and equitably be applied to the terms as articulated before you on June 11, 2007. I begin by discussing our problems with the bank's draft settlement agreement with the most important first, and going in declining order of importance.

The **first** and most important objection to the draft settlement agreement is found in Paragraph 2. That paragraph contains a provision that permits the bank to trigger a default under the litigation settlement agreement as against the Quinns if they fail to maintain insurance coverage on the real property in Woodbine, or if they fail to maintain its physical condition adequately. This point was never discussed as part of the settlement agreement. Indeed the settlement agreement as placed on the record and as seen elsewhere in paragraph 2 make clear that this is an afterthought.

The settlement agreement was to the effect that the bank was entitled to pay the real property taxes and entitled to add that to the mortgage amount with interest. It was articulated in court that the obligation to pay the taxes was on the Quinns, but that the bank has the right to make the tax payments. It was never said that a failure by the Quinns to pay the taxes would trigger a default, and nothing else was ever mentioned.

This is critical because the only insurance on the property now is "stop loss" type coverage carried by the bank to protect the bank's interest. The Quinns are not in a position, and the bank certainly knows this, to obtain and pay for insurance or to pay for ongoing maintenance of the property, most of which has been deferred during the pendency of this litigation.

The Honorable Joseph C. Visalli, J.S.C.
October 15, 2007
Page 3

This is an absolutely critical issue, because as drawn, it would permit the bank to declare a default the day after the agreement is executed, whether by the parties or Your Honor, and deprive the Quinns of the benefit of that which they negotiated and obtained in the settlement of June 11, 2007.

From their perspective, given the way the relationship between them and the bank has developed, Your Honor can appreciate that they take a dark view of the importation of this term in an agreement without prior discussion. On the other hand, from an outside point of view it can be seen that this is the sort of thing a bank might often call for, but in the circumstances of this case it was neither negotiated for nor agreed to.

The **second** issue for the court to consider in terms of what is or is not required in the agreement is found in Paragraph 9. Paragraph 9 is brief, never agreed to, and something new inserted by the bank post negotiations. This is a provision that provides that a pending condemnation proceeding against the Quinns will not stay their obligation to close under the settlement agreement. This is impossible on its face. The Quinns have no control over the filing of a condemnation action. They certainly don't want to see the property condemned, and are not suggesting that it will be condemned. By the same token they certainly cannot sell or refinance the property while it is under condemnation. In the unlikely event that a condemnation action is filed against this property, the bank and the Quinns will have to deal with that circumstance at the time it arises. Without any details as to what portion of the property might be condemned, or what price may be offered for it, or indeed who the condemning agency might even be, there is no way to agree in advance on this. This is simply an afterthought by the bank which should be excluded from the agreement.

The **third** item that the Quinns reject as a term of any agreement between them and the bank is found in Paragraph 6. Paragraph 6 of the agreement discusses the timing and mechanism whereby the Quinns would find a buyer and enter into a contract to sell the property within 12 months, and then in the event that they had a bona fide buyer under contract by the end of the 12 months, there would be an additional six months window

The Honorable Joseph C. Visalli, J.S.C.
October 15, 2007
Page 4

for the Quinns and their buyer to close and payoff the bank and receive the financial benefits of the settlement agreement.

What the bank did is put in a provision which was no part of any agreement, which talks about an undefined "related buyer." We don't know who a related buyer is, although obviously a close family member would related and somebody else might not be. The first vice of this is that it was never agreed to. The second vice is that is undefined, and seeks a 15% deposit by a buyer that apparently the bank would deem to be related to the Quinns. If, for example Mr. Quinn turns out to be the favorite nephew of the Bill Gates, the simplest form agreement from him to buy the property would probably be accepted by the bank as bona fide, and made on the part of a creditworthy buyer, even in the face of a close family relationship.

By the same token it could certainly happen that an arms length buyer enters into what everyone involved, at least on the selling and banking side, believes is a viable and bona fide transaction, and then the deal falls apart to the Quinns' detriment. Certainly that is a risk that the Quinns take. If the Quinns cannot find a buyer and go to closing within 18 months they lose the $200,000.00 credit. If they can go to closing with a buyer and pay off the mortgage within that 18 month window then they do get the benefit of the payoff. It doesn't matter who that is, and there was no agreement ever made to draw classifications of buyers in terms of what deposits they must make.

The **fourth** item which was never agreed to before Your Honor and cannot reasonably be inferred as a proper extension of any agreement can be found in Paragraph 11. Paragraph 11 provides first that the Quinns execute a consent order vacating the previously entered order vacating the sheriff's sale in this action. That was not discussed or agreed to, but given the terms of the agreement reached, we concede that that it certainly falls in the parameters of additional housekeeping items that need to be done in order to give the bank the benefit of its side of the bargain.

That paragraph goes on to say, again reasonably, that the bank will not request a sheriff's sale unless the Quinns default on the agreement. The final sentence of this paragraph, however, asks for a very substantial concession on

The Honorable Joseph C. Visalli, J.S.C.
October 15, 2007
Page 5

the part of the Quinns - and one that would be very harmful to them in certain circumstances. That sentence provides that the Quinns unconditionally waive their right to request any adjournments of the sheriff sale and their right of redemption.
It is certainly within the realms of possibility that for whatever unfortunate circumstances the Quinns will be unable to produce a qualified buyer within the 18 month period. That will lose them the $200,000.00 settlement amount. That does not mean that they cannot continue to try and sell the property, just that the bank will receive more money at closing after the 18 months than it would before. If they need to adjourn a sale briefly to consummate a closing, the court cannot doubt that the judge sitting in chancery at that time would give them that time on an adequate showing. This is similarly the case with the right of redemption. This is not only an inequitable term, it was not obtained through negotiation or agreement.

The **fifth** provision of substantial concern is found in Paragraph 17. The parties agreed before Your Honor that if any of the Quinn entities went into bankruptcy they would not object to a motion on the part of the bank for relief from the stay of the sheriff's sale of the subject property. They agreed to that on June 11, 2007.

What they did not agree to is that the bank would be entitled to a dismissal of the case, or to a finding that the bankruptcy would be filed in bad faith.

Of course the Quinns don't want to file bankruptcy on behalf of themselves or any of their companies any more than anyone else does. None of us can predict the future, however, and by consenting to a motion for relief from the stay, they have done everything that can reasonably be asked of them in this regard. They never agreed to anything else and nothing further should be imposed upon them.

The **sixth** consideration is a little more general. In paragraph 1, for example, there is a lot of language about how the amounts due cannot be disputed. There is also a provision that a monthly statement will be sent to the Quinns. Even though this Agreement was reached in June of this year, *no monthly statement has yet been given.*

Case 08-33787-JHW    Doc 25-2    Filed 02/05/09    Entered 02/05/09 18:56:00    Desc
Exhibit B 10.15.07 Letter of Barry    Page 7 of 19

10/15/2007  15:02    6097296686              BARRY, CORRADO ATTY.                    PAGE  07/39

The Honorable Joseph C. Visalli, J.S.C.
October 15, 2007
Page 5

    The **seventh** and final point about which we seek a court ruling has to do with language found in Paragraph D in the recitals of the first page of the agreement and in paragraph 13. This has to do with what amounts to essentially speculation on the part of the bank about what the respective tax consequences would be to the parties in the event that the Quinns are able to pay off the mortgage within 18 months. It is no part of the agreement between the parties that either make any representations to each other, to the court, to the Internal Revenue Service, or to any other taxing entity as to what their own tax consequences may be from these transactions or what the tax consequences to the others are.

    It is appropriate enough for the bank to point out that they take no position with regard to the tax consequences to the Quinns. That point has been made and taken. There is no reason to lard up an agreement with this kind of language.

    I doubt that anyone involved in this transaction has sufficient tax expertise to predict what the tax consequences will be, let alone to predict how all the details of this debt and property ownership will play out ultimately. It was never agreed to and should not part of any ultimate agreement.

    I have taken the liberty of drafting a proposed form of order which would substitute for a written agreement between the parties. In other words, the court, having heard the representations on the record, having examined the draft, being familiar with the underling litigation, and having considered the positions as articulated in the pending motion, is satisfied to define the terms of the settlement.

    My understanding is that Your Honor will be doing that if you deem that you are able on the record generated.

    If not, Your Honor has directed a hearing to be held before you on Wednesday, October 31, 2007, 1:30 p.m. at your courtroom in Cape May Court House, New Jersey.

    There may be logistical difficulties with this, but I may be supplying a supporting certification from the Quinns on some of these points, I do not expect that, however, to raise additional or different considerations for your Honor, only to give factual support to any issues that may require it.

The Honorable Joseph C. Visalli, J.S.C.
October 15, 2007
Page 7

    Thank you for your attention and consideration in this matter.

                      Respectfully yours,

                      BARRY, CORRADO, GRASSI & GIBSON, P.C.

                      Stephen W. Barry

SWB/sh
Enclosures
cc  Steven J. Reed, Esquire
    Lewis J. Schweller, Esquire
    Michael Quinn

Frank L. Corrado, Esquire
BARRY, CORRADO, GRASSI & GIBSON, P.C.
2700 Pacific Avenue
Wildwood, NJ  08260
(609) 729-1333
Attorneys for Defendants Quinn-Woodbine Realty &
Leasing Co., L.L.C. and Michael Quinn

| | |
|---|---|
| BANC of AMERICA LEASING & CAPITAL, LLC, successor by merger to Fleet Capital Corporation, successor by merger to Summit Business Capital Corporation | SUPERIOR COURT OF NEW JERSEY LAW DIVISION CAPE MAY COUNTY DOCKET NO. CPM-L-605-01 |
| Plaintiff, | Civil Action |
| vs. | ORDER ESTABLISHING TERMS OF COMPLETE SETTLEMENT OF LITIGATION |
| QUINN-WOODBINE REALTY & LEASING CO., L.L.C., and MICHAEL QUINN, | |
| Defendants. | |
| and | |
| DALEY HODKIN CORP., | |
| Intervenor. | |

THIS MATTER has been in litigation before this Court for a considerable time. It came before the Court for trial on June 11, 2007, at that time Steven Reed, Esquire, appeared for plaintiffs, Frank L. Corrado for the Quinn defendants, and Lewis Schweller, Esquire, for the intervenor auction company.

Settlement terms were placed on the record at that time. In addition, a motion to fix the terms of the settlement has been briefed and argued to the court.

Based on that record the court is able and satisfied to determine all outstanding issues as to all parties in this matter based on their articulation of the settlement among them.

IT IS THEREFORE ORDERED this _____ day of _____, 2007, as follows:

1. The balance due as of November 20, 2007, on the Chancery Judgment under Docket No. F-16397-01 is hereby determined to be $_____. No party shall hereafter dispute the amount of this judgment as of the date of this order. Interest shall be computed on that judgment hereinafter as provided by R 4:42-11.

2. The parties agree that the Quinns and their business entities will make the payments due on the real estate taxes on the real property in Woodbine, New Jersey which is the security for the loan which is the subject matter of this litigation. In the event that the Quinns do not make such payments and the bank makes the payments those advances on account of real estate taxes shall be added to the bank's lien on the property that is the subject of the foreclosure ion this action. Those payments will be added to the judgment amount in the chancery division action and shall be subject to interest.

3. If the Quinns are able to close on and settle this property or otherwise payoff the bank's loan in mortgage, within 18 months of November 1, 2007, then and in that event, the bank plaintiff and the Quinn defendants will share 50/50 in the sheriff's fee that will be due to the sheriff based on execution

2

activities on this property.

4. The plaintiff bank and the Quinn defendants agree that the amount to be paid on the Chancery Division Judgment, as set out above, shall be reduced by the sum of $200,000 if the Quinn parties go to settlement and pay off the mortgage on or before April 30, 2009.

5. In the event that the Quinn defendants pay the settlement amount as defined in the immediately above paragraph on or before April 30, 2008, then the amount due under the chancery judgment, plus any advances that may have been made by the bank, shall be reduced by an additional $25,000.00, so that the total reduction, shall be $225,000.00.

6. The plaintiff bank and the Quinn defendants agree that the Quinns have until October 31, 2008, if they have not already paid the settlement amount or executed a bona fide contract for sale of the property. Provided that the Quinn parties have entered into such a binding sales agreement by October 31, 2008, they shall have until April 30, 2009, to pay the settlement amount to the bank and the bank shall accept the settlement amount plus any amounts advanced by the bank to preserve the property. If, after October 31, 2008, any contract buyer terminates any sales agreement through no fault on the part of the Quinn parties, the Quinn parties shall have an additional 60 days from the buyer's notice of cancellation to pay the settlement amount. This 60 day extension shall not extend the April 30, 2009, date, which is the last date on which the Quinns

get the benefit of the $200,000 reduction in the Chancery judgment amount as provided herein.

7. Payment of the Chancery judgment amount, plus any advances on account of taxes or any such items as made by the bank after this judgment, less either or both of the $200,000 or $25,000 credit as provided herein shall be accepted by the bank in full satisfaction of both the Law Division judgment and the chancery division judgment, and the bank's warrant to satisfy those judgments shall be filed on payment.

8. The plaintiff bank shall not be required to release its foreclosure judgment lien, in whole or in part, unless the total settlement amount, whatever that may be at a specific time, is paid in full.

9. The Quinn parties agree to provide to the bank and its attorney copies of all sales contracts, addendums, riders, notices of cancellations of contracts, and closing statement in connection with any potential or actual sale of the Woodbine property. The Quinn parties shall keep the bank advised of all closing dates with respect to the property, and shall direct any closing agent to include the settlement amount in the closing statement so that the bank is paid what it is due under this Agreement out of any closing on the property. The bank shall be made aware of the place and time of the closing and the bank's representative is permitted to attend the closing to collect the proceeds if the bank so chooses.

10. The Quinn parties shall immediately execute a consent

4

order to vacate the existing stay of the sheriff's sale in the foreclosure action in this matter. The bank will not request the sheriff to schedule a sheriff sale unless the Quinn parties default under this Agreement.

11. The Settlement Amount shall be made payable to **"Banc of America Leasing & Capital, LLC"** and shall be sent to Edward W. Wilson at the address below, with a copy to Steven J. Reed, Esquire:

> Edward W. Wilson
> Banc of America Strategic Solutions, Inc.
> RI 1-102-15-01
> 111 Westminster Street
> Providence, RI 02903

12. In the event that the Settlement Amount is not paid to Bank under the terms of this Agreement, then the Bank is entitled to immediately take any lawful action to enforce, recover and collect on either of its judgments in this matter with notice to the Quinns. Any recovery of money on one judgment is a credit as against the other judgment. Both judgments are on the same claim.

13. The plaintiff bank has obtained environmental phase I and II reports with respect to the Woodbine property. Upon execution of this Order, the bank shall forthwith provide copies of both of these reports to the Quinns' attorney. The Quinns attorney is authorized to provide copies to the Quinns. The Quinns parties agree not to disclose these reports to any third party unless the bank agrees to such disclosure, which disclosure

5

shall not be unreasonably withheld. The bank is entitled to have the Quinns and any third party to whom the reports are provided sign an environmental indemnity agreement in reasonable form.

14. In the event that either of the Quinns personally or any of their entities file a bankruptcy, this Order establishes the agreement of Michael Quinn and Marita Quinn on behalf of themselves and their legal entitles that they will consent to and not oppose any application by the bank in a bankruptcy court for relief from the automatic stay with regard to the Woodbine property.

15. Upon completion of the terms of this agreement, the Quinn parties and the Bank shall exchange releases, and any and all judgments in this matter will be discharged by a warrant to satisfy.

16. With respect to the settlement between the bank and the Daley Hodkins' defendants, following are Paragraphs a to c, which comprise the terms of the agreement between the bank and the Daley Hodkins parties as drafted by attorney Steven Reed and they are incorporated herein upon the representation by the attorney for the bank and Daley Hodkin that these constitute the entire agreement between these parties.

### THE SETTLEMENT BETWEEN THE BANK AND THE DALEY HODKIN PARTIES.

a. The Bank and Daley Hodkin Corporation agree to resolve the cross claims for indemnification under the auction contract dated January 24, 2002 by the Bank depositing the total amount of $125,000 (the "DH Indemnity Payment") into the Trust

6

Fund Unit of Superior Court upon notice to Daley Hodkin Corporation and on notice to the law firm of Sullivan & Manarel which law firm has asserted an attorney lien on any proceeds paid to Daley Hodkin Corporation. The Bank and Daley Hodkin Corporation will cooperate and work together to follow appropriate procedures (consent order and/or interpleader complaint naming Daley Hodkin Corporation and Sullivan Manarel etc.) to effectuate the deposit of the funds The Bank and Daley Hodkin Corporation ("Daley Hodkin") agree that, within seven (7) days of execution of this Agreement, they will submit a consent order, to be drafted by Bank's counsel, to the Court (Law Division, CPM-L-605-01) to permit the deposit of the DH Indemnity Payment and thereby relieve the Bank from the controversy. The Bank agrees to deposit the DH Indemnity Payment with the Court within ten (10) days of receipt of the Court order allowing the Bank to make the deposit. The Bank and Daley Hodkin agree that the Bank will *first* attempt to have the Court enter a consent order signed by the Bank and Daley Hodkin to allow the deposit of the funds in Court and to thereby extricate the Bank from the dispute between Daley Hodkin and Sullivan & Manarel. If the Court disapproves of or fails to enter the proposed Consent Order for any reason, the Bank shall, within fourteen (14) days of such disapproval or failure (but in any event, no later than twenty (20) days from the day that the Consent Order was sent to the Court), either 1) file an interpleader action seeking to permit said deposit into Court and to permit the dismissal of the Bank

· 7

from that action (this would create a separate docket number and would name Daley Hodkin Corporation and Sullivan & Manarel as defendants and seek to relieve the Bank from the controversy etc.), or 2) follow any other necessary steps required by the Court to permit the Bank to deposit said funds in Court on notice to Daley Hodkin and Sullivan & Manarel, and to thereby extricate and dismiss the Bank from the action.

      b.  Daley Hodkin Corp. and Daley Hodkin Appraisal Corp., Joseph Hodkin, Morris Hodkin and Cindy Korman (as to any legal fees and costs that may be owed to her for representation of the Daley Hodkin Parties), and those parties' employees, agents, heirs, assigns, successors and representatives, effective upon the execution of this Agreement, jointly and severally, release, acquit and forever discharge the Bank **and** the Quinn Parties, their agents, employees, attorneys, successors and assigns both present and former of and from any and all manner of action and actions, cause and causes of action, suits, debts, controversies, damages, judgments, executions, claims, cross claims, indemnifications, and demands whatsoever, asserted or unasserted, in contract, tort, law or in equity against Bank or the Quinn Parties which these releasing parties ever had, now have or which any releasing party ever had or now has upon or by reason of any matter, cause, causes or thing whatsoever up to the date of this Agreement, including, without limitation, any presently existing claim or defense whether or not presently suspected, contemplated or anticipated.  This release is related

8

and limited to the claims and cross claims, indemnifications etc. arising from and/or related to the litigation in the Law Division case (CPM-L-605-01) relating to the commercial reasonableness of the Auction. The Daley Hodkin Parties' release, and other agreements herein, are effective upon execution of this Agreement. However, the Daley Hodkin release shall be rescinded if the Bank fails to deposit the DH Indemnity Payment into the Trust Fund Unit of Superior Court under the terms set forth above in Paragraph 21 of this Agreement; provided, however, that such right of rescission shall not be construed as relieving the Bank of its obligation to deposit the DH Indemnity Payment as set forth in paragraph 21, which obligation is not conditional or subject to the Bank choosing to comply, or not, with such obligation. If such right of rescission has been exercised, due to the Bank's failure to make the DH Indemnity Payment as required by paragraph 21, then such rescission shall be rescinded upon the Bank depositing the DH Indemnity Payment. Notwithstanding the above, this release by Cindy Korman is without prejudice to Cindy Korman collecting her legal fees and costs from the DH Indemnity Payment or any other person other than the Bank and the Quinn Parties.

These releasing parties (Daley Hodkin Corp., Daley Hodkin Appraisal Corp., Joseph Hodkin, Morris Hodkin and Cindy Korman) agree not to take any action whatsoever to involve the Bank in the pending lawsuit in New York filed by Sullivan & Manarel against Daley Hodkin et al., including but not limited to, the

9

filing of any third party complaint against the Bank, which right the Daley Hodkin Parties have waived and released herein, subject, however, to the Bank depositing the DH Indemnity Payment as required by paragraph 21; provided, however, that the foregoing shall not be construed as relieving the Bank of its obligation to deposit the DH Indemnity Payment as set forth in paragraph 21, which obligation is not conditional or subject to the Bank choosing to comply, or not, with such obligation. If the Daley Hodkin Parties have taken action to involve the Bank in such suit due to the Bank's failure to make such deposit of the DH Indemnity Payment pursuant to paragraph 21, then, upon the Bank making such deposit, the Daley Hodkin Parties shall dismiss their claims in such suit against the Bank.

Notwithstanding any other term or provision contained herein to the contrary, this release by the Daley Hodkin Parties and this Agreement shall not in any manner whatsoever waive, release, modify or otherwise affect the Daley Hodkin Parties' rights and remedies regarding any loan, credit or banking transactions or other obligations in connection therewith of the Bank with or to the Daley Hodkin Parties, if any.

c.  The Bank and its agents, assigns, predecessors, and successors, effective upon signing this Agreement, release, acquit and forever discharge the Daley Hodkin Corp. and Daley Hodkin Appraisal Corp. from any and all manner of action and actions, cause and causes of action, suits, appeals, debts, controversies, damages, judgments, executions, claims, cross

10

claims, indemnifications, and demands whatsoever, asserted or unasserted, in contract, tort, law or in equity which the Bank ever had, now have or which any the releasing party ever had or now has upon or by reason of any matter, cause, causes or thing whatsoever up to the date of this Agreement, including, without limitation, any presently existing claim or defense whether or not presently suspected, contemplated or anticipated. This release is related and limited to the claims and cross claims, indemnifications etc. arising from and/or related to the litigation in the Law Division case (CPM-L-605-01) relating to the commercial reasonableness of the Auction. Notwithstanding any other term or provision contained herein to the contrary, this release by the Bank and this Agreement shall not in any manner whatsoever waive, release, modify or otherwise affect Bank's rights and remedies regarding any loan or credit transactions or other obligations of the Daley Hodkin Parties with or to the Bank, if any.

JOSEPH C. VISALLI, J.S.C.

11